Ecco High Frequency Corporation v. Commissioner.
Ecco High Frequency Corp. v. Commissioner
Docket No. 7608.
United States Tax Court
1946 Tax Ct. Memo LEXIS 114; 5 T.C.M. (CCH) 688; T.C.M. (RIA) 46189; August 7, 1946
*114 C. F. Rothenburg, Esq., 1000 Shoreham Bldg., Washington, D.C., for the petitioner. Scott A. Dahlquist, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in petitioner's income tax, declared value excess profits and excess profits tax for 1941 in the respective amounts of $6,666.50, $4,404.18 and $12,168.95. There are two issues - (1) the reasonableness of compensation paid to petitioner's principal officer, and (2) the amount of the deduction to which petitioner is entitled for attorney fees paid or accrued within the taxable year. Findings of Fact Petitioner is a corporation with its principal place of business presently located at 7020 Hudson Boulevard, North Bergen, New Jersey. During the taxable year 1941 it was located at 120 West 20th Street, New York, N. Y. Its income tax returns for that year were filed with the Collector of Internal Revenue for the Second District of New York. The returns were made on the accrual basis. Petitioner's business is the manufacture of electrical high frequency industrial heating equipment. It was organized in 1937, under the direction of Emil R. Capita, and at *115 all times since has been under his management and control. All the petitioner's capital stock, consisting of 100 shares, was issued to Capita's uncle, Henry Mach, and his aunt, Fanny Bruning, who furnished the original capital for the venture. They each subscribed $2,000 and received 50 shares of the capital stock. They entered into a written agreement with Capita, dated January 12, 1937, in which it was stated that they had "advanced and loaned" the amounts of their stock subscriptions to Capita; that they held the shares issued in their names "for the exclusive use and benefit" of Capita; that they would assign over the shares to Capita at any time upon his repayment to them of the subscription price of the shares; that they would make no other assignment of the shares except subject to the terms of the agreement; that in the meantime they would be entitled to receive all dividends paid on the shares; and that in the event of the liquidation of the corporation before such repayment they would be entitled to receive $2,000 each and the balance of the liquidating dividends would be payable to Capita. This agreement was signed by Capita and Henry Mach and was witnessed but it was not *116 signed by Fanny Bruning. Neither of the stockholders of record ever took any active part in the conduct of the business. Capita emigrated to this country from Austria-Hungary in 1912, when he was nine years of age. He attended grammar school and high school in New York City and then began a specialized study in the electrical field. In 1917 he began working as an apprentice with Frostberg Motor Works, a manufacturer of electric motors and equipment. Subsequently, he was employed by Charles A. Borne Company, servicing generators and transmitter equipment on warships, the Otis Elevator Company, doing various kinds of electrical work, and also by the Standard Electric Equipment Company, the Splitdorf Electric Company, and the L. & S. Ignition Company, as manager of one of its stores. In 1926 Capita joined the Lepel High Frequency Corporation as factory superintendent at a salary of $75 a week. That company was then manufacturing a high frequency converter used in automobile motors. About two years later it began the manufacture of industral high frequency equipment. Capita remained with the company until he organized the petitioner company in 1937. The manufacture of high frequency *117 electrical equipment is a specialized field. Having gained a thorough knowledge of the business through his studies and employment with the Lepel Company, Capita decided that it would be advantageous for him to organize a business of his own. His uncle and aunt agreed to furnish the necessary capital to organize the petitioner company. The business has been under the management and control of Capita at all times. During the years 1939, 1940 and 1941, he held the offices of president and treasurer and was the only salaried officer of petitioner. He designed all of the equipment manufactured by petitioner, purchased all of the materials and sold all of the finished products. Most of the sales resulted from his personal contacts. As sales engineer he would secure a contract for a particular type of equipment, design it himself, supervise its manufacture, and see that it was properly installed and capable of functioning satisfactorily. Among petitioner's customers were Westinghouse Electric & Manufacturing Company, Peerless Laboratories, Electro Products Company, and the A. C. Spark Plug Company. In his last year with Lepel, Capita received a salary of about $6,000. His highest yearly *118 salary with that company was about $10,000 or $12,000. The following table shows petitioner's gross sales (less "returns and allowances"), officers' salaries, net income, federal tax, and dividends paid, for the years 1937 to 1941, inclusive, as reported in its income tax returns for the respective years: Gross sales
less returns
and
Officers'
Dividends
Year
allowances
salaries
Net income
Federal tax
paid
1937
$ 16,926.75
(a) $ 3,835.00
$ 358.09
$ 51.78
None
1938
21,224.87
(b) 2,467.00
667.59
83.45
None
1939
35,581.19
(c) 7,040.00
849.57
106.20
$240.00
1940
69,489.12
(c) 20,840.00
2,940.15
461.35
240.00
1941
222,346.65
(c) 56,000.00
41,274.25
20,779.45
None
Of the 1937 and 1938 salaries the amounts of $2,400 and $427, respectively were paid to Theo Bruning, brother of Fanny Bruning, who served as president of the company until his death in the latter part of 1938. The balance of the salaries for those years, and all of the 1939, 1940 and 1941 salaries, were paid to Capita. During all of these years Capita devoted all of his time to the business and worked long hours. He always regarded the business as *119 his own and directed all of his efforts towards making it a success. Petitioner did not employ any salesmen but during the taxable year 1941 did pay out commissions of $8,784 to sales agents who recommended its products to prospective purchasers. It was the custom of the trade to pay all sales agents commissions of 40 per cent on sales of high frequency heating equipment made within the City of New York and slightly more on sales made outside of the New York territory. At the beginning of 1941 petitioner had about nine or ten employees but the number was increased to twenty by the end of the year. All of these employees but one, who did office work, were shop workmen whom Capita had trained for the particular jobs they were doing. One of them, a graduate electrical engineer, was Capita's assistant. At a meeting of petitioner's stockholders held December 28, 1939, it was agreed that for that year Capita should receive as compensation commissions of 15 per cent of petitioner's gross sales. His compensation for 1940 was raised to 30 per cent of gross sales at a stockholders' meeting held December 16, 1940. The same percentage of gross sales, 30 per cent, was voted to him by the *120 directors at a meeting held December 16, 1941, with the provision, however, that his total compensation should not exceed $56,000 for that year. Capita, being a director, was present at that meeting. During 1941 petitioner occupied one floor, approximately 23 X 85 feet, of a building located at 120 West 20th Street, New York, N. Y. Its total invested capital for that year was approximately $7,600. Of the $56,000 which petitioner reported in its return for 1941 as compensation for officers the respondent allowed $25,000 and disallowed the balance, $31,000, as being unreasonable. In 1937, after Capita had left the Lepel High Frequency Corporation that company brought suit against him to restrain him from using certain trade secrets, patents and devices in the manufacture of high frequency heating equipment. The court granted an injunction restraining Capita from ever engaging in the manufacture of high frequency equipment. The injunction was later upheld by the court of appeals in New York. Capita engaged Irving Mariash as counsel to resist the injunction. Mariash thought that the injunction was unenforceable and advised Capita to go ahead with his plans to operate the Ecco High *121 Frequency Corporation, which he did. Lepel then instituted proceedings to enforce the injunction against Capita. It also sought an injunction against the petitioner corporation. Several years more of litigation ensured before the matter was finally settled in 1941. In handling the litigation Mariash never made any distinctin, in point of his employment, between Capita as an individual and petitioner as a corporation. The cross appeals and other counter actions which he instituted were sometimes brought in the name of Capita and sometimes in petitioner's corporate name, as best served his purpose. As compensation for his services petitioner paid to Mariash, or accrued to him in its books in 1941, legal fees totaling $4,597.98. Of that amount $2,997.98 was paid during the year either in cash or by petitioner's checks drawn by Capita and the balance, $1,600, was accrued at the end of the year and paid during subsequent years. Mariash never had any formal agreement with Capita as to the compensation that he would receive for his legal services, either on behalf of Capita individually or the petitioner, and no segregation of such compensation was ever made. Capita never kept any record *122 of and never had any receipts for the cash payments which he made to Mariash. In its return for 1941 petitioner claimed a deduction of $4,597.98, representing the entire amount of legal fees paid or accrued to Mariash in that year. The respondent disallowed $1,972.61 of the amount claimed on the ground that it was paid, or accrued, for services rendered to petitioner individually, and was not an expense of the petitioner corporation. Opinion LEMIRE, Judge: We will first consider the question of the reasonableness in amount of the compensation which petitioner paid to Capita in the taxabli yar 1941. The evidence is that Capita was solely responsible for petitioner's success as a manufacturer of high frequency heating equipment. He organized the business himself as a means of realizing upon his personal knowledge and skill in that highly specialized field. From the beginning he managed and operated it as the sole owner. During most of the time he held all of the important offices and did practically all of the work except the actual labor performed by his trained workmen. Petitioner and the Commissioner made much of their respective contentions as to whether Capita was in reality *123 the owner of petitioner's capital stock which nominally was held by his aunt and uncle. The agreement of January 12, 1937, purporting to be an agreement entered into between all three of the parties but signed by only two of them, Capita and his uncle, would unquestionably support the Commissioner's contentention that Capita was the beneficial owner of all the stock, if the agreement had been fully executed. That is, of course, a question as to whether equity would not correct the defect and supply the omitted signature, the instrument being otherwise authenticated, upon a showing that it was the intention of the parties to enter into a binding agreement. The circumstances suggest that Capita may have been content for the petitioner's stock to stand in the names of his uncle and aunt because of the onerous litigation in which he was involved from the time of petitioner's organization. These questions, however, are not vital to our determination of the issues presented. In any event, it is plain that Capita was in complete control of petitioner and could fix his own compensation at whatever figure he desired within the limits of the company's earnings. In the formative years 1937 *124 and 1938, when the business was getting on its feet, Capita drew only a nominal salary. When gross sales increased from above $35,000 in 1939 to over $69,000 in 1940, Capita's compensation was increased from $7,040 to $20,840. With gross sales of over $222,000 in the taxable year 1941, his compensation was increased to $56,000. Dividends of only $240 were paid in 1939 and 1940, while in 1941 there were no dividends. Obviously all of the parties considered the business and the profits therefrom as belonging to Capita and not the stockholders. The amount of Capita's compensation was not fixed until near the close of each year when the earnings of the business could be determined with reasonable certainty. Granting, however, that Capita could and did determine the amount of his own compensation each year according to petitioner's earnings, we must still determine whether his compensation for the taxable year 1941 was reasonable in amount, and if not, what would have been a reasonable amount in view of all the circumstances. Evidence was adduced that other companies engaged in the same business as petitioner and situated somewhat similarly paid their top officers salaries not in excess *125 of $10,000. In addition to these salaries, however, they paid commissions to sales agents of several times the amounts of the officers' salaries. In the petitioner's case, Capita personally did all of the selling and consequently the sales expenses were only nominal. The evidence does not show how much of his time Capita actually devoted to selling as distinguished from the time he devoted to his many other duties. Neither is there any evidence as to the demand or market for the type of goods manufactured by the petitioner. It may well be that due to the demand for that particular type of goods no sales efforts were required to dispose of all of the equipment produced. We do not think that a "reasonable allowance" of compensation to Capita for personal services actually rendered could be said to include an arbitrary percentage of gross sales based on the customary commissions paid to established sales agents. The test of the statute is the reasonableness of the salary or compensation for services actually rendered. The fact that compensation is paid on a percentage basis pursuant to an employment contract is no reason for its disallowance. For instance, in *126 (C.C.A.-5), where the taxpayer corporation paid out all of its profits for the taxable year to its officers under employment contracts, the court allowed the deduction. The taxpayer there was financially unable to continue in business and contracted with the officers that if they would operate the business they might take all of the profits for the ensuing year as their compensation. The court observed that "the reasonableness of the contract is to be view in the light of the circumstances that existed when it was made." Speaking of percentage compensation contracts the Supreme Court said in : * * * Even if binding upon the parties, such an agreement does not change the character of the purported compensation or constitute it, as against the Government, an ordinary and necessary expense. * * * Capita's compensation for the taxable year was not agreed upon until near the close of the taxable year and until the amount of the profits was reasonably certain. There was no element of risk either on his or petitioner's part. The Commissioner has determined that $25,000 rather than the $56,000 which Capita received was a *127 reasonable amount of compensation for his services in the taxable year. The answer to our question, perhaps, is to be found in a figure somewhat between the amount claimed by petitioner and that allowed by the Commissioner. We should bear in mind that Capita in addition to his usual duties as president, treasurer and general manager of the petitioner was also its sales engineer and as such purchased all needed supplies and sold, designed and installed all equipment manufactured by the petitioner. From a consideration of all the evidence we think $40,000 was a reasonable amount for Capita to receive in 1941. The Commissioner is sustained only as to his disallowance of the excess of that amount. The remaining issue involves the question of the right of petitioner to deduct the attorney fees paid or accrued in 1941. Petitioner claimed a deduction of $4,597.98, of which the Commissioner has disallowed $1,975.61 on the ground that that portion of the fees was paid for services which the attorney, Mariash, performed on behalf of Capita individually and not for petitioner. The evidence is that Mariash represented both the petitioner and Capita individually during the several years of *128 litigation beginning in 1937 and continuing through the taxable year 1941, and that the corporate interests of petitioner and the individual interests of Capita were so closely related that no segregation of the charges for such services was ever made by any of the parties. Payments were made to Mariash from time to time in varying amounts, some by checks drawn on petitioner's account by Capita, and some in cash. None of the parties kept any records to show for what particular services the payments were made. Initially an injunction had been obtained by Lepel High Frequency Corporation against Capita individually. Later on an injunction was sought against the petitioner also. Lepel was attempting to prevent Capita from ever engaging in the manufacture of high frequency heating eqipment either in his individual capacity or through the petitioner corporation. In these circumstances it seems to us that the Commissioner's allowance to Capita individually of only $1,972.61 of the total amount of $4,597.98 of fees paid to Mariash was reasonable and leaves no cause for complaint by petitioner. On this issue the Commissioner is sustained. Decision will be entered under Rule 50.